**Electronically Filed
Supreme Court
SCAP-20-0000487
23-SEP-2022
09:28 AM
Dkt. 48 OP**

IN THE SUPREME COURT OF THE STATE OF HAWAI'I

---o0o---

_____

KIA'I WAI O WAI'ALE'ALE, an unincorporated community association,
Plaintiff-Appellant,

vs.

DEPARTMENT OF WATER, COUNTY OF KAUA'I, applicant and accepting
agency of the subject environmental assessment,
Defendant-Appellee.

_____

SCAP-20-0000487

APPEAL FROM THE ENVIRONMENTAL COURT OF THE FIFTH CIRCUIT
(CAAP-20-0000487; CIV. NO. 5CC181000063)

SEPTEMBER 23, 2022

RECKTENWALD, C.J., NAKAYAMA, McKENNA, WILSON, AND EDDINS, JJ.

OPINION OF THE COURT BY McKENNA, J.

## I.    Introduction

This transfer case addresses the required scope of

environmental review under the Hawai'i Environmental Policy Act

("HEPA") and its administrative rules. The Department of Water, County of Kaua'i ("KDOW") proposes to install an 18-inch-diameter water transmission line in the Līhu'e area. The proposed line ("relief line") will run approximately 9,000 feet in length and connect on each end to existing KDOW water lines. Pursuant to HEPA, KDOW prepared a draft environmental assessment ("DEA") for the relief line and made an anticipated finding of no significant impact ("AFONSI"). After receiving comments on the DEA, KDOW published its final environmental assessment ("FEA") and made a finding of no significant impact ("FONSI").

Kia'i Wai o Wai'ale'ale ("Kia'i Wai") challenged the FEA in the Environmental Court of the Fifth Circuit ("environmental court").[1] In part, Kia'i Wai argued KDOW did not comply with HEPA and its administrative rules because the FEA does not analyze how the relief line would facilitate greater water withdrawals and impact streams in Kaua'i's southeastern watersheds. Kia'i Wai also argued the relief line was improperly "segmented" from certain Līhu'e development projects and a water treatment plant project, and those projects therefore should have been analyzed as part of the same "action." The environmental court granted summary judgment in favor of KDOW as to all of Kia'i Wai's claims.

---

[1] The Honorable Kathleen N. A. Watanabe presided.

2

We hold KDOW did not properly analyze the impact of water withdrawals facilitated by the relief line. The FEA does not analyze possible increased water withdrawals, concluding the relief line "will not increase withdrawal of water." However, the record--including the FEA itself--indicates the relief line will carry more water from an upgraded water treatment plant to meet the needs of new developments. HEPA and its administrative rules require analysis of "secondary impacts," which can occur outside the physical footprint of a project.

Additionally, KDOW may have improperly "segmented" the relief line from planned development projects and a water treatment facility project. We clarify the "independent utility" test and hold that a project may be improperly segmented from other projects even if it has some independent utility. We adopt the "double" or "multiple" independent utility test and hold the independent utility test requires courts to consider whether each of the projects--not just one of the projects--would occur independently.

Hence, we conclude KDOW must prepare a new environmental assessment ("EA") that complies with HEPA and its administrative rules. We also address Kia'i Wai's other claims.

## II.   Background

### A.   Factual background

#### 1.   The Līhu'e Development Plan and the proposed relief line

According to the FEA, in 1994, the Hawai'i Land Use Commission approved the Līhu'e-Hanamā'ulu Master Planned Community proposal ("Līhu'e Development Plan").  The Līhu'e Development Plan covers approximately 515 acres, nearly all the acreage available for development in the Līhu'e area, and includes residential units, commercial and industrial properties, and public facilities.  The Līhu'e Development Plan was submitted by Amfac/JMB Hawaii, Inc.  Grove Farm Company, Inc. ("Grove Farm") is the successor in interest to Amfac/JMB Hawaii, Inc. and is required to participate in the funding and development of water source, storage, and transmission facilities for the Līhu'e Development Plan.

In 2009, Kodani & Associates Engineers, LLC prepared a "Water Master Plan" to address the water requirements of the Līhu'e Development Plan.  The developments in the Līhu'e Development Plan ("Līhu'e developments") will be[2] served by

---

[2]   The relief line FEA states the Līhu'e developments "will be" served by the Līhu'e system, suggesting the developments had not been completed as of 2018.  The record does not indicate the current status of the Līhu'e Development Plan.  At oral argument before this court, counsel was unaware of the current status of the Līhu'e developments or the related Waiahi Surface Water Treatment Plant described below.

KDOW's Puhi-Līhuʻe-Hanamāʻulu-Kapaʻa Water System ("Līhuʻe system").  The Līhuʻe system is a public water system operated by KDOW that serves residential, commercial, industrial, public, and resort uses.

The relief line FEA describes how the relief line is necessary to meet the water transmission needs of the Līhuʻe Development Plan:

> The Water Master Plan identified a decrease in system pressures and flows as a result of the [Līhuʻe] Development Plan unless transmission and distribution improvements were provided.  Hydraulic modeling showed that the pressure at the Māʻalo Road and Kūhiō Highway intersection, 102' elevation, exceeded the 125 [pounds per square inch] maximum under average day demands.  As a result of the excess pressure, elevation, and velocity restrictions, the current transmission line capacity is deemed inadequate. The proposed Relief Line is necessary to address this capacity limitation.

(Emphasis added and endnote omitted.)

The FEA explains that the relief line will create more capacity to transmit water from the Waiahi Surface Water Treatment Plant ("Waiahi SWTP")[3] and certain wells.  The Waiahi SWTP is of particular importance to this case.  As the FEA explains, "[t]he Waiahi SWTP is a major source of potable water for the Līhuʻe system.  The current capacity of the Waiahi SWTP is 3.0 million gallons per day (MGD) in accordance with various governmental regulations and approvals."

---

[3]   The relief line FEA also refers to the Waiahi SWTP as the "Grove Farm Surface Water Treatment Plant."

The FEA explains:

> KDOW determined that the [existing water main] is not adequate to transmit the current source water without exceeding the 6 [feet per second ("FPS")] max flow rate allowed by Hawai'i Water System Standards ("WSS").  The proposed Relief Line is necessary to meet WSS standards (6 FPS max flow criteria) with current sources on Mā'alo Road.
>
> . . . .
>
> The proposed Relief Line will improve the overall water system transmission capability by transmitting water from Waiahi SWTP, Pukaki well, and Hanamā'ulu Wells 3 and 4 sources, which are the existing sources on Mā'alo Road, directly to the central Līhu'e area.  It will also improve the system's reliability because it creates transmission redundancy from the existing sources on Mā'alo Road to central Līhu'e which has the greatest demand in the system.

(Emphasis added.)

Thus, the FEA indicates the relief line is necessary to address a "capacity limitation," which is "a result of the [Līhu'e] Development Plan," and also to improve reliability and transmission of "current source water."

Grove Farm will pay one-third of the estimated $3 million project cost, and KDOW will pay two-thirds.

## 2.   Water sources

As indicated by its name, the Waiahi SWTP treats surface water rather than groundwater.  The Waiahi SWTP draws water from at least two surface water hydrologic units: #2040, Wailua, and #2042, Hanamā'ulu.[4]

---

[4]   A "hydrologic unit" is a surface drainage area, a ground water basin, or a combination of the two.  Hawai'i Revised Statutes ("HRS") § 174C-3 (2011).  The Commission on Water Resource Management ("the CWRM") manages the

(continued . . . )

Water for the Waiahi SWTP is stored in the Kapaia Reservoir before treatment for use in KDOW's water system.[5]  Water reaches the Kapaia Reservoir by way of the Hanamā'ulu Ditch, which diverts water from the South Fork Wailua River.  The South Fork Wailua River is, in turn, fed by numerous streams.  Some of those streams, including Wai'ale'ale Stream and Waikoko Stream, are diverted by the 'Ili'ili'ula North Wailua Ditch and their waters pass through hydropower plants before reaching the South Fork Wailua River.  The diversion points of Wai'ale'ale Stream and Waikoko Stream are located on state Department of Land and Natural Resources ("DLNR") forest reserve land.

A Commission on Water Resource Management ("CWRM") document explains the importance of Wai'ale'ale Stream, Waikoko Stream, and other nearby water resources to traditional and customary Hawaiian practices:

> The region has tremendous historic and cultural importance and features prominently in Hawaiian spiritual practices. The waters carry the literal and spiritual nourishment from the mountain to the ocean that Hawaiian communities have relied upon for generations.  As such, the physical presence of stream diversions has a negative effect on these practices and restoration of mauka to makai streamflow is critical to protecting Hawaiian culture.

---

( . . . continued)
State's water resources based on designated hydrologic units.  See HRS § 174C-31(h), (i) (2011).

[5]   One way to understand the relevant water sources and diversions is by reference to a schematic of the water system.  A schematic of diversions in the Wailua hydrologic unit is contained in the record as part of an August 21, 2018 CWRM staff submittal recommending amended interim instream flow standards for Wai'ale'ale Stream and Waikoko Stream ("2018 CWRM staff submittal").

### 3.    Draft environmental assessment and comments

KDOW is the "proposing agency" for the relief line and is therefore responsible for preparing an EA and determining whether an environmental impact statement ("EIS") is required. See Hawai'i Administrative Rules ("HAR") § 11-200-9 (replaced 2019). The EA for the relief line was prepared by Kodani & Associates Engineers, LLC, the same firm that prepared the Water Master Plan for the Līhu'e Development Plan.[6]

KDOW made an AFONSI and published the DEA for the relief line in the Office of Environmental Quality Control's ("OEQC's") Environmental Notice on February 8, 2018.[7]

Kia'i Wai and its members submitted comments on the DEA until March 12, 2018, the day comments were due. Kia'i Wai submitted two comments as described below.[8]

---

[6]    References to "KDOW" in this opinion may refer to Kodani & Associates Engineers, LLC acting on behalf of KDOW.

[7]    In 2021, the OEQC was renamed the "Environmental Review Program" and transferred from the Department of Health to the Office of Planning and Sustainable Development. See 2021 Haw. Sess. Laws Act 152, at 567-78.

[8]    Additionally, on June 30, 2017, before the publication of the February 8, 2018 DEA, the State of Hawai'i Department of Hawaiian Home Lands ("DHHL") submitted comments in response to KDOW's early consultation request. DHHL expressed concern about how the relief line project would impact DHHL's future planned developments in Wailua and potential lo'i kalo uses of DHHL lands. DHHL also stated that the relief line DEA should discuss impacts to surface water resources and cultural uses of those resources. Thus, DHHL recommended an EIS be prepared for the relief line.

### a. Comments by Sustainable Resources Group Int'l, Inc. on behalf of Kia'i Wai

Sustainable Resources Group Int'l, Inc. ("SRGII") prepared comments on behalf of Kia'i Wai. The comments alleged numerous shortcomings with the DEA, including a lack of hydraulic analysis demonstrating the existing line was inadequate. SRGII also noted:

> [T]here are several statements that mention the relief line is sized to provide future transmission needs, without any discussion and/or reference to future needs. This raises the question as to whether this proposed relief line is part of plans to increase conveyance capacity in the pipeline network to meet future water demands. If in fact this proposed project is part of future actions that affect water use and increase consumptive uses, then it is logical to surmise there will be increased withdraws from source surface and/or groundwaters in the future to meet demand. As such, pursuant to Chapter 343, the DEA should consider cumulative impacts of all actions proposed as part of future water uses, and not just assessment of the Relief Line.

KDOW responded by stating, "[T]he proposed Relief Line will increase water transmission capacity within the existing KDOW water system; however, it will not result in any increase of the withdrawal of any of the groundwater or surface water sources."

### b. Comments by Bridget Hammerquist on behalf of Kia'i Wai and minutes from KDOW board meetings

Bridget Hammerquist ("Hammerquist"), a co-founder of Kia'i Wai, submitted comments on behalf of Kia'i Wai and attached minutes from KDOW's December 2009 and January 2010 board meetings. According to Hammerquist, the KDOW meeting minutes "confirm the [relief line] was proposed as part of Grove Farm's

9

application to KDOW for approval of [a] Plan to increase capacity at the [Waiahi] SWTP."

The December 17, 2009 KDOW board meeting included KDOW board members, KDOW staff members, and representatives from Grove Farm.  One agenda item for the meeting was "Manager's Report No. 10-30 – Request Board Approval of Grove Farm's Request to Add Capacity to the Waiahi Treatment Facility."[9]  As documented in the meeting minutes, the KDOW staff recommended the board allow Grove Farm to increase the capacity of the Waiahi SWTP.  However, the KDOW staff had "reservations" about "available water" and "transmission capacity needed for the new flow rate."

Regarding water availability, the staff noted that the Kapaia Reservoir is large but "it is not known at this time" whether increasing the capacity of the treatment plant would affect water availability in the reservoir.  The staff requested

_____

[9]    At a March 13, 2019 hearing on one of KDOW's motions for partial summary judgment, counsel for KDOW stated, "The minutes from the 2009 excerpt that [Kia'i Wai's attorney] attached, again, relates to a wastewater treatment facility that was proposed back in 2009."  This was incorrect.  The attached minutes referred to "potable water production" from a reservoir.  The FEA states that the Waiahi SWTP "is a major source of potable water for the Līhu'e system."

At oral argument before this court, counsel for KDOW stated that the meeting minutes were "not properly brought up" before the environmental court.  However, if the environmental court did not recognize the relevance of the meeting minutes, this could have been due to KDOW's representation that the minutes referred to a wastewater treatment plant.

10

a flow-duration study to measure the water flowing through the reservoir, the water taken out, and the reservoir level.

Next, the KDOW staff had concerns about transmitting the increased quantity of water from the facility once the treatment capacity increased.  Apparently, at the time of the board meeting, there was an existing agreement between KDOW and Grove Farm, which acknowledged additional transmission capacity could be necessary and allocated the costs of transmission upgrades.[10] One of the solutions to the transmission problem discussed at the board meeting was the "Ehiku bypass line," another name for the proposed relief line.[11]  The Grove Farm representatives at the meeting made clear that the bypass line was necessary for the expansion of the Waiahi SWTP:  "[Mr. Nishimura, a KDOW board member] asked the applicant if they do the expansion would it

---

[10]    The agreement stated:

> [T]he parties acknowledge that a portion of the BWS water transmission system located in the Hanamaulu area in Kuhio Highway (from Kapaia Bridge to Wilcox Hospital and running toward Kapaa), which is intended to transport portions of the delivered water, may require upsizing or replacement, due to a physical size constraint, in order to accept the quantity of delivered water contemplated by this agreement.  The parties have agreed that any mutually approved cost required to upsize or replace the described portion of the transmission system or to install an additional transmission line along the cane haul road/Ehiku Street route, as each are shown on the map attached as Exhibit 3 (the "Pipeline Improvement Map") shall be borne 66.67% by BWS and 33.33% by Grove Farm.

(Emphasis added.)

[11]    The FEA describes how the proposed relief line connects from Māʻalo Road to ʻEhiku Road via the privately owned Kapaia Cane Haul Road.  Similarly, the "Ehiku bypass line" described in the board meeting would travel "along [Grove Farm's] cane haul road connecting to Ehiku and Isenberg Roads."

require this line to go in; Mr. Tresler [a Grove Farm representative] replied, 'yes.'"  Mr. Tresler also stated that "they need to install this line now," and "the bottom line is the Ehiku line needs to go in if we expand the plant."

The meeting minutes also indicate the Waiahi SWTP expansion was essential to the Līhu'e Development Plan.  The Water Master Plan identified the Waiahi SWTP as the water source for the Līhu'e developments, and KDOW's approval of the Waiahi SWTP expansion would help Grove Farm secure funds from lenders.[12]

Minutes from the January 28, 2010 KDOW board meeting indicate the KDOW board approved Grove Farm's request to expand

---

[12]     The minutes include the following exchange:

> Mr. D. Fujimoto [a KDOW board member] felt that the applicant did have urgency and wondered if they needed a decision today.

> Mr. Costa [a KDOW board member] wondered if they were trying to get their Water Master Plan.  Mr. Tresler replied that it was approved and their source was sited as Waiahi.  He said they won't shut down if they don't get approval today; but at the same time, he couldn't understand why they couldn't get an approval today because it is an important aspect when you go to lenders and they ask if you have water, but they don't have the papers from the Department of Water approving this.

> Mr. Costa wondered if this has a bearing on Wailani project.  Mr. Tresler replied that it does and includes Ahukini Makai and Kohealoa, and they have to move quickly once it is closed.

The projects referenced in this exchange are some of the projects in the Līhu'e Development Plan.  The FEA states: "The Līhu'e Development Plan described the planned development plans of the Wailani project (Molokoa, Ahukini Mauka, and Ahukini Makai) and the Hanamā'ulu Triangle project." (Endnote omitted.)

the Waiahi SWTP.  At the meeting, the parties noted the expansion project might not take place until many years later.[13]

In light of these meeting minutes, Kia'i Wai posed the following question in its comments on the relief line DEA:  "Is the proposed change part of a larger water capacity delivery plan and if so how does the current KDOW DEA comply with [Hawai'i Revised Statutes ("HRS") chapter 343] and its requirement that environmental assessments not be performed on segments of a larger development plan?"

In response to Kia'i Wai's comments and the attached meeting minutes, KDOW wrote:

> The scope of this project is limited to addressing an existing hydraulic deficiency in [KDOW's] existing water distribution system.  There is no proposed increase in source capacity with this project.  Additionally, . . . "The Proposed Relief Line addresses existing inadequate transmission facilities and is not a commitment to larger actions."  The proposed project is independent of other actions.  The existing capacity of the Waiahi [SWTP] is not being changed [within] the scope of this project, nor will this Project modify the capacity of the Waiahi [SWTP].

**4.    Final environmental assessment**

By letter dated March 12, 2018, KDOW transmitted the FEA and FONSI to the OEQC for publication in the Environmental Notice.

The FEA includes a section on water resources.  In that section, the FEA reviews the water sources that supply the Līhu'e

---

[13]    The KDOW board imposed the condition that the expansion was to be completed by September 30, 2018.  The record does not reflect whether Grove Farm later received an extension.

system and discusses the interim instream flow standards[14] for

those sources.  The FEA's section regarding "potential impacts"

on water resources states in its entirety:

> The proposed Relief Line will increase water transmission capacity within the existing KDOW water system; however, it will not result in any increase of the withdrawal of any of the groundwater or surface water sources.  The maximum rate of flow from the existing groundwater wells and Waiahi SWTP will not increase as a result of the installation of the proposed Relief Line.  As such, the proposed Relief Line is in compliance with both the [Water Resource Protection Plan] and the Interim Instream Flow Standard as contained in HAR § 13-169-45.
>
> The proposed Relief Line has no significant adverse impact on the hydrologic resources or characteristics of the area and therefore, no mitigation measures are proposed.

The FEA also includes a section on "secondary and

cumulative impacts" of the project, which states:

> The Līhu'e Development Plan described the planned development plans of the Wailani project (Molokoa, Ahukini Mauka, and Ahukini Makai) and the Hanamā'ulu Triangle project.  These planned developments account for approximately 515 acres of land, or nearly all the acreage available for development in the Līhu'e area, and include single and multifamily residential units, commercial, industrial properties, and public facilities (YWCA, parks).
>
> The proposed Relief Line does not increase source and storage in the Līhu'e area; the proposed Relief Line will not increase withdrawal of water.  It is necessary to address the current system limitations.  [A]ddressing the current system limitation, through increasing the size of the pipe, may result in the availability of additional transmission capacity.  Such additional capacity would be available to future development, subject to the Water System Standards. . . . The proposed Relief Line addresses existing inadequate transmission facilities and does not induce, change, or intensify unplanned growth or development.

(Emphasis added and endnote omitted.)

---

[14]   See infra note 33.

B.    **Procedural background**

1.    **Environmental court proceedings**

a.    **Complaints**

On October 17, 2018, Kia'i Wai filed an amended complaint against KDOW.[15]  The amended complaint challenged KDOW's failure to analyze the relief line's impact on water resources, alleging: (1) because the FEA did not analyze increased water use facilitated by the relief line, KDOW violated HEPA and its administrative rules, HRS § 195D-4 (2011),[16] KDOW's public trust obligations, and article XII, section 7 of the Hawai'i Constitution;[17] and (2) KDOW improperly "segmented" its environmental review by failing to consider impacts of the Līhu'e Development Plan despite acknowledging the relief line is a necessary precedent to the Līhu'e development projects.  The amended complaint also alleged the following procedural violations: (1) KDOW could not have adequately considered public

---

[15]    On April 23, 2018, Kia'i Wai filed a "Complaint for Declaratory, Injunctive, and Other Relief" against KDOW, Grove Farm, the Department of Public Works ("DPW") of the County of Kaua'i, and the State of Hawai'i Department of Transportation ("DOT") in the environmental court.  In the amended complaint, Kia'i Wai removed Grove Farm, DPW, and the DOT as defendants, so that only KDOW remained as a defendant.

[16]    HRS § 195D-4 is part of the Hawai'i endangered species statute.

[17]    Article XII, section 7 of the Hawai'i Constitution states: "The State reaffirms and shall protect all rights, customarily and traditionally exercised for subsistence, cultural and religious purposes and possessed by ahupua'a tenants who are descendants of native Hawaiians who inhabited the Hawaiian Islands prior to 1778, subject to the right of the State to regulate such rights."

comments on the DEA because KDOW transmitted its FEA to the OEQC the same day comments were due; and (2) KDOW relied on input from the CWRM yet did not include the substance of the CWRM's input in the FEA. Additionally, the amended complaint alleged neither KDOW nor Grove Farm holds a water lease or permit from the state Board of Land and Natural Resources ("BLNR"), and KDOW violated HRS § 171-58 (2011)[18] by failing to obtain a lease or permit prior to granting rights to use state land and water resources. Kia'i Wai also sought injunctive relief.[19]

### b. Motions for summary judgment

KDOW filed motions for partial summary judgment, which together addressed all of Kia'i Wai's claims.

In its motions, KDOW maintained "the Relief Line's purpose is limited to addressing an existing hydraulic deficiency in the County's existing water distribution system and [] there is no proposed increase in source capacity with this project." KDOW argued that if Kia'i Wai's view were adopted, environmental review of the water source would be required "for every repair

---

[18]    HRS chapter 171 addresses the management and disposition of public lands. HRS § 171-58 states in part, "Except as provided in this section, the right to any mineral or surface or ground water shall not be included in any lease, agreement, or sale, this right being reserved to the State," and, "Disposition of water rights may be made by lease at public auction as provided in this chapter or by permit for temporary use on a month-to-month basis . . . ."

[19]    Although not addressed on appeal, KDOW also alleged: (1) the FEA does not analyze reasonable alternatives to the relief line; and (2) the FEA fails to discuss how the proposed relief line will be used and why the existing transmission line is inadequate.

project that the County does . . . whether it's a repair or . . . just a replacement line . . . ."

KDOW also contended the relief line was not improperly segmented from the Līhu'e Development Plan:

> It is undisputed that the Grove Farm Final EA[20] was completed, accepted, and approved in 1994.  It is also undisputed that the purpose of the Relief Line is to provide redundancy and reliability to KDOW's water system.  Given this, the Relief Line has utility separate and independent from that Development Plan, and is neither a condition precedent to nor dependent on the Development Plan.

Additionally, KDOW asserted it was not required to obtain a lease or permit for water pursuant to HRS § 171-58 because HRS § 54-15 (2012) empowers the KDOW board to "manage, control, and operate the waterworks of the county and all property thereof, for the purpose of supplying water to the public in the county . . . ."

In opposition, Kia'i Wai argued that the FEA itself states that the relief line is needed because of the Līhu'e developments.  Kia'i Wai also provided a declaration from hydrologist and water resource engineer Matt Rosener ("Rosener").  The declaration stated that, in light of plans to expand the capacity of the Waiahi SWTP, "it seems highly likely that increased water transmission capacity through the proposed Relief Line will trigger subsequent development of water

---

[20]    This document is not in the record.

processing capacity." In addition to referencing the KDOW board meeting minutes, Rosener cited a Department of Health inspection report for the Waiahi SWTP dated March 16, 2018, which stated that the facility "is slated for an upgrade that will increase production capacity from 3.00 [MGD] to 4.77 MGD."

Rosener also quantified how the relief line would increase transmission capacity:

> If the proposed Relief Line is constructed, the new limiting main segments will be the 16" pipelines that the Relief Line would connect to at either end. The transmission capacity in this scenario would be 5.41 MGD which is 178% of the existing capacity of 3.05 MGD. This is [] not insignificant. Future water demand estimates for Līhuʻe-Puhi presented in KDOW's Water Plan 2020 are 4.07 MGD and 5.50 MGD for 2020 and 2050, respectively.

Rosener concluded:

> Given the potential for this project to 1.) trigger other water system development and 2.) result in continued inter-basin water transfer from several stream sources, including those under current water appropriation contested case status, it seems that potential impacts to the stream water sources should have been evaluated by KDOW and their consultant in the environmental review process.

Additionally, Kiaʻi Wai argued KDOW was required to obtain a lease or permit from the BLNR for its use of water from state lands. Kiaʻi Wai asserted an EIS has never been done for the Līhuʻe system, and KDOW would be required to prepare an EIS once it applies for a lease or permit from the BLNR.

By orders entered April 2, 2019, October 3, 2019, and June 30, 2020, the environmental court granted summary judgment in favor of KDOW as to all the counts in Kiaʻi Wai's amended

18

complaint.  The environmental court entered final judgment in favor of KDOW on June 30, 2020.

### 2. Appeal

Kia'i Wai filed a notice of appeal to the Intermediate Court of Appeals ("ICA") on July 29, 2020.  Kia'i Wai asked the ICA to: (1) reverse the environmental court's orders granting summary judgment to KDOW;[21] (2) declare that KDOW violated HEPA and KDOW is required to prepare an EIS and obtain a "lease, license[,] or revocable permit" to use state water pursuant to HRS § 171-58; and (3) issue a temporary injunction against "extraction and transport of water" from Kauai's eastern and southeastern watersheds until KDOW completes an EIS for its "water transport system" and obtains a "lease, license[,] or revocable permit . . . ."

We granted Kia'i Wai's application to transfer the case to this court.[22]  After completion of briefing, oral argument took place on April 5, 2022.

### III. Standards of Review

#### A. Summary judgment

> Hawai'i appellate courts review an award of summary judgment de novo under the same standard applied by the

---

[21]    Kia'i Wai does not challenge the environmental court's disposition of Counts V (failure to consider alternatives) and VI (failure to include certain required information) in the amended complaint.

[22]    Hui Ho'opulapula Nā Wai o Puna and the Sierra Club (collectively, "amici") were also granted leave to appear and file an amicus brief.

circuit court. . . . Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. . . . The moving party bears the burden of demonstrating that there is no genuine issue as to any material fact with respect to the essential elements of the claim or defense and must prove that the moving party is entitled to judgment as a matter of law.  This court must review the evidence and inferences in the light most favorable to the non-moving party.

In cases of public importance, a circuit court should grant a motion for summary judgment sparingly, and never on limited and indefinite factual foundations.

Kilakila 'O Haleakala v. University of Hawai'i ("Kilakila"), 138 Hawai'i 364, 375, 382 P.3d 176, 187 (2016) (cleaned up).

## B.   Agency determinations under HEPA

For agency determinations under HEPA, the appropriate standard of review depends on the specific question under consideration.  Generally, a court reviews agency determinations that involve factual questions under a clearly erroneous standard.  An agency's conclusion of law that presents mixed questions of fact and law is reviewed under the clearly erroneous standard because the conclusion is dependent upon the facts and circumstances of the particular case.  However, whether or not an agency has followed proper procedures or considered the appropriate factors in making its determination is a question of law, and will be reviewed de novo.

Kilakila, 138 Hawai'i at 375–76, 382 P.3d at 187–88 (cleaned up).

A finding of fact or a mixed determination of law and fact is clearly erroneous when

(1) the record lacks substantial evidence to support the finding or determination, or (2) despite substantial evidence to support the finding or determination, the appellate court is left with the definite and firm conviction that a mistake has been made.  We have defined "substantial evidence" as credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion.

20

In re Water Use Permit Applications ("Waiāhole I"), 94 Hawai'i 97, 119, 9 P.3d 409, 431 (2000) (cleaned up).

This court "must take a 'close look' at agency decisions that involve the public trust." Kauai Springs, Inc. v. Plan. Comm'n of Kaua'i, 133 Hawai'i 141, 165, 324 P.3d 951, 975 (2014) (citation omitted). "As in other cases, agency decisions affecting public trust resources carry a presumption of validity." 133 Hawai'i at 164, 324 P.3d at 974 (citation and emphasis omitted).

## IV.   Discussion

### A.   Secondary impacts

The purpose of HEPA is to "ensure that environmental concerns are given appropriate consideration in decision making" and to "alert decision makers to significant environmental effects which may result from the implementation of certain actions." HRS § 343-1 (2010). To facilitate informed decision-making, an EA must be prepared "at the earliest practicable time to determine whether an environmental impact statement shall be required . . . ." HRS § 343-5(b) (2010 & Supp. 2012). "Upon completion of the final environmental assessment, if the reviewing agency determines that the proposed action is likely to cause a significant impact on the environment, an environmental impact statement must be prepared. Alternatively, if the reviewing agency determines that the proposed action will

not result in a significant environmental impact, then the agency must issue and publish a finding of no significant impact . . . ." Kilakila, 138 Hawai'i at 370-71, 382 P.3d at 182-83 (citation omitted).

"In determining whether an action may have a significant effect on the environment, the agency shall consider every phase of a proposed action, the expected consequences, both primary and secondary, and the cumulative as well as the short-term and long-term effects of the action." HAR § 11-200-12(b) (replaced 2019)[23] (emphasis added). "Secondary impacts" or "secondary effects" are "effects which are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable," including "growth inducing effects and other effects related to induced changes in the pattern of land use, population density or growth rate, and related effects on air and water and other natural systems, including ecosystems." HAR § 11-200-2 (replaced 2019).

Thus, if increased water withdrawals are a "reasonably foreseeable" result of the proposed relief line, then they should be analyzed as secondary impacts. But, in this case,

---

[23]   HEPA's administrative rules, HAR title 11, chapter 200, were repealed and replaced by HAR title 11, chapter 200.1, effective August 9, 2019. See 2019 HI REG TEXT 490491 (Aug. 31, 2019).

The changes to HEPA's administrative rules do not substantially alter the provisions at issue in this case, so the court's holdings here should also apply to title 11 chapter 200.1.

KDOW determined the relief line "will not increase withdrawal of water."

We conclude KDOW failed to properly consider increased water withdrawals as a secondary impact, for two reasons. First, to the extent the FEA finds that water withdrawals will not increase, this finding is clearly erroneous. Second, KDOW misapplied HEPA by limiting its review to the physical footprint of the project and failing to consider secondary impacts beyond the project site.

### 1. KDOW clearly erred in finding water withdrawals will not increase

KDOW contends it properly analyzed impacts on water sources because the relief line will not result in increased water withdrawals. In the sections on "secondary impacts" and "potential impacts," the FEA states that "the proposed Relief Line will not increase withdrawal of water" and "will not result in any increase of the withdrawal of any of the groundwater or surface water sources." KDOW told the environmental court that "the Relief Line's purpose is limited to addressing an existing hydraulic deficiency in the County's existing water distribution system . . . ." At oral argument, KDOW's counsel told this court: "[T]he [] amount of water that [is] going through now and the [] amount of water that will be going through in the future will be the same; it's just that you now have a different pipe

system to deliver that water more efficiently; so it's the speed of the water going through the pipes, not necessarily the amount of water going through the pipes."[24]

However, to the extent the FEA makes a factual finding that no additional water will be transported by the relief line, this finding is clearly erroneous.

Although the FEA does indicate the relief line will help achieve compliance with water "velocity" requirements, the FEA provides no evidence that the relief line will not increase water withdrawals. For instance, the FEA does not include any water demand projections indicating Līhu'e water use will remain static even though the relief line increases the transmission system capacity. Nor does the FEA indicate the water supply to the Līhu'e system is somehow constrained (perhaps due to the capacity of the Kapaia Reservoir or the water sources). Nor does the FEA provide any other explanation for why water withdrawals will not increase (for instance, even if the relief line facilitated greater water use, perhaps the water would be reallocated from other areas so water withdrawals would not increase overall).

To the contrary, the FEA on its face indicates the relief line will facilitate increased water use. According to the FEA,

---

[24] KDOW's counsel also stated: "We're not going to draw more water or less water through the pipe; all this basically does is improve the hydraulic efficiency-- . . . ."

the relief line will not only affect water "velocity" but will also "increase water transmission capacity within the existing KDOW water system . . . ."[25]   (Emphasis added.)   The FEA also explicitly states that the relief line is "sized to provide for future transmission needs."

Further, the FEA indicates the additional capacity will be put to use: the FEA explains that "[t]he Water Master Plan identified a decrease in system pressures and flows as a result of the [Līhuʻe] Development Plan unless transmission and distribution improvements were provided. . . . The proposed Relief Line is necessary to address this capacity limitation." (Emphasis added.)   In plain terms, the FEA says a bigger pipe is needed to transmit more water and meet the needs of over 500 acres of planned development.

---

[25]   The "velocity" of the water is likely directly related to the amount of water transmitted by the pipe.   Although the record does not include details about what "velocity" means in this context, in general the velocity of water in a pipe (feet per second) is a function of the flow rate (gallons per minute, or million gallons per day) and the inverse of the pipe diameter squared.   See Washington State University, Pipe Water Velocity and Minimum Pipe Diameter, http://irrigation.wsu.edu/Content/Calculators/General/Pipe-Velocity.php, also available at https://perma.cc/AZ95-9RGQ.

   Thus, by "increasing the size of the pipe," the relief line could seemingly transmit more gallons per minute, or million gallons per day, without exceeding a given velocity, such as the 6 FPS maximum velocity under the Water System Standards.

Apart from the FEA, Kia'i Wai provides additional evidence that the relief line will lead to increased water use.[26]  KDOW board minutes show the KDOW board approved an expansion of the Waiahi SWTP, and a Department of Health report from 2018 confirmed the Waiahi SWTP "is slated for an upgrade that will increase production capacity from 3.00 [MGD] to 4.77 MGD . . . ."  Additionally, hydrologist and water resource engineer Rosener explained the relief line would increase the transmission capacity of the water system by 78 percent. Rosener also noted that, according to KDOW's own planning documents, Līhu'e water demand will increase from an estimated 4.07 MGD in 2020 to 5.50 MGD in 2050.

In sum, the record demonstrates the relief line will facilitate increased water use and increased withdrawals from surface or groundwater sources, or both.  There is increasing demand (over 500 acres of planned development).  There is increasing supply to meet that demand (capacity upgrades to the Waiahi SWTP).  And the purpose of the relief line is to connect a greater supply of water to meet the greater demand.

Contrary to KDOW's arguments, the possibility of increased water use is not too speculative.  "Secondary impacts" are "effects which are caused by the action and are later in time or

---

[26]    As discussed below, to demonstrate issues with the environmental review process, plaintiffs may introduce evidence that was not part of the environmental review process.

farther removed in distance, but are still reasonably foreseeable."  HAR § 11-200-2.  The record before us sufficiently demonstrates that increased water withdrawals are a "reasonably foreseeable" result of the relief line.[27]

## 2.  KDOW misapplied HEPA'S requirement to analyze secondary impacts

As discussed above, the FEA does not provide a candid assessment of how the relief line could facilitate increased water use by transporting water from the upgraded Waiahi SWTP to planned developments.  Thus, KDOW's conclusion that the relief line "will not result in any increase of the withdrawal of any of the groundwater or surface water sources" is not a factual statement about the likely impact of the relief line.  Rather,

---

[27]    Although Kia'i Wai focuses on Wai'ale'ale Stream and Waikoko Stream, the record suggests increased water use facilitated by the relief line may not necessitate increased diversion of Wai'ale'ale Stream and will not necessitate increased diversion of Waikoko Stream.  As discussed above, the water for the Kapaia Reservoir and Waiahi SWTP is diverted from the South Fork Wailua River and reaches the reservoir through the Hanamā'ulu Ditch.  Water diverted from Wai'ale'ale Stream and Waikoko Stream contributes to the flow of the South Fork Wailua River after passing through hydroelectric plants.  However, according to the 2018 CWRM staff submittal, the diversion of Wai'ale'ale Stream only represents a small portion of the South Fork Wailua River flow.  Thus, even if more water is diverted from the South Fork Wailua River through the Hanamā'ulu Ditch, this may not necessitate greater or continued diversion of Wai'ale'ale Stream.  Additionally, increased water use from the Waiahi SWTP would appear to not require greater or continued diversion of Waikoko Stream because the waters of Waikoko Stream would reach the South Fork Wailua River regardless of whether they are diverted for use in the hydroelectric plants.  In sum, although not completely clear, the record suggests that the portion of the South Fork Wailua River below the Hanamā'ulu Ditch is the area that would be impacted by increased water use from the Waiahi SWTP.  The record does not indicate how or whether greater diversion of the South Fork Wailua River would impact tributary streams.  In any case, the FEA does not describe the impacts to the water resources that would be affected.

this conclusion is merely a statement that the relief line project itself does not entail any changes to water sources.[28]

KDOW's narrow scope of environmental review does not comport with HEPA's requirement to consider secondary impacts. Critically, KDOW fails to differentiate between "the scope of the proposed action and scope of the [H]EPA review." Cf. Border Power Plant Working Grp. v. Dep't of Energy, 260 F. Supp. 2d 997, 1014 (S.D. Cal. 2003). KDOW is correct that "[t]he existing capacity of the Waiahi [SWTP] is not being changed [within] the scope of this project . . . ." (Emphasis added.) However, for the purpose of HEPA review, "in addition to the direct site of impact the agency must also consider other impacts that are incident to and a consequence of the primary impact." Sierra Club v. State Dep't of Transp. ("Superferry I"), 115 Hawai'i 299, 341, 167 P.3d 292, 334 (2007) (cleaned up). Indeed, the definition of "secondary impacts" explicitly includes "effects which are caused by the action and are later in time or farther removed in distance . . . ." HAR § 11-200-2 (emphasis added).

We previously addressed secondary impacts in Superferry I. See 115 Hawai'i at 338, 167 P.3d at 331. That case concerned

---

[28]    The FEA contains several carefully worded sentences to this effect. For instance, the FEA states, "The maximum rate of flow from the existing groundwater wells and Waiahi SWTP will not increase as a result of the installation of the proposed Relief Line," and, "The proposed Relief Line does not increase source and storage in the Līhu'e area . . . ."

certain harbor improvements that were necessary for a proposed inter-island ferry service.[29]  115 Hawai'i at 305, 167 P.3d at 298.  We determined the state Department of Transportation ("DOT") failed to properly consider secondary impacts when it "studiously restrict[ed] its consideration of environmental impact to the physical harbor improvements themselves" and ignored the impacts from the actual operation of the ferry service.  115 Hawai'i at 342, 167 P.3d at 335.  We concluded DOT should have considered the harbor improvements' "facilitation" of the ferry project as a secondary impact.[30]  Id.

Superferry I is analogous to this case.  The relief line could similarly "facilitate" additional water use, and the FEA should have analyzed impacts to water resources as secondary impacts.  See id.  Just as the operation of the ferry service was a reasonably foreseeable result of the harbor upgrades in Superferry I, increased withdrawal and use of water is a

---

[29]    Superferry I concerned an "exemption determination": "DOT's determination that the improvements to Kahului Harbor to accommodate the Superferry project [were] exempt from the requirements of HEPA, thus obviating the need for an EA."  115 Hawai'i at 306, 167 P.3d at 299.  However, Superferry I is applicable to the FEA in this case even though it concerned a different aspect of HEPA analysis.  The court in Superferry I cited to the same HAR provisions at issue in this case and relied on a case about an FEA. 115 Hawai'i at 339 n.49, 341, 167 P.3d at 332 n.49, 334.

[30]    Along the same lines, in Kilakila, we held that a particular telescope project was not a secondary impact of the University of Hawai'i's Observatory Site Management Plan.  See 138 Hawai'i at 380-81, 382 P.3d at 192-93.  We noted that the management plan imposed restrictions that would apply to the telescope project; because the management plan did not "facilitate, or make easier," the telescope project, the telescope project was not a secondary impact of the management plan.  Id. (footnote omitted).

29

reasonably foreseeable result of the transmission upgrade here.
See id.  And, like in Superferry I, KDOW cannot limit the scope
of its environmental analysis to the physical footprint of the
project.  See id.

In fact, one of our earliest HEPA cases supports the
sensible proposition that water transmission infrastructure
implicates water resources.  Molokai Homesteaders concerned a
private corporation's request to "rent space" in a public water
system to transport water from its well in central Moloka'i to a
resort complex it planned to develop at the island's west end.
Molokai Homesteaders Co-op. Ass'n v. Cobb, 63 Haw. 453, 456–57,
629 P.2d 1134, 1138 (1981).  The court determined the relevant
agency approval occurred before HEPA's effective date but noted
an EIS would likely have been required had HEPA been in effect:

> We entertain no doubt that the pertinent statutory
> provisions would mandate the preparation of an EIS if
> Kaluakoi's application for "rental of space" in the
> [Moloka'i Irrigation] System's facilities were presented to
> the Board now [that HEPA is effective].  A proposal whose
> approval would facilitate the development of a large resort
> complex in a previously unpopulated area through the use of
> the Molokai Irrigation System's pipeline, allow water to be
> transported from its source to another area, and cause a
> rise in the salinity of the system's irrigation water would
> be within the purview of activities covered by Chapter 343.
> The use of a government pipeline, the implicit commitment
> of prime natural resources to a particular purpose, perhaps
> irrevocably, and the substantial social and economic
> consequences of the governmental approval of the proposal
> would dictate the preparation of an EIS.

63 Haw. at 466–67, 629 P.2d at 1144 (emphasis added and footnote
omitted).  Like in Molokai Homesteaders, "the use of the

transmission facilities" in this case clearly implicates water resources.  See 63 Haw. at 455, 629 P.2d at 1137.

### 3.   Independent utility

The fact that the relief line addresses existing capacity constraints and provides reliability benefits does not excuse KDOW from considering the impacts associated with increased water withdrawals.

Barnes v. U.S. Department of Transportation is instructive. See 655 F.3d 1124 (9th Cir. 2011).  In Barnes, the Ninth Circuit invalidated the FEA for a new runway at an airport because the FEA did not consider the impacts of increased airplane traffic as an indirect effect of the proposed runway.[31]  655 F.3d at 1136-39.  The court rejected the defendants' argument that "an EA need not account for the growth-inducing effects of a project designed to alleviate current congestion."  655 F.3d at 1138. The court concluded: "[E]ven if the stated purpose of the project is to increase safety and efficiency, the agencies must analyze the impacts of the increased demand attributable to the

---

[31]   Hawai'i courts consider case law on HEPA's federal counterpart, the National Environmental Policy Act ("NEPA").  See Superferry I, 115 Hawai'i at 306, 167 P.3d at 299.  NEPA law has historically referred to "indirect" effects, which are equivalent to secondary impacts under HEPA.  See 40 C.F.R. § 1508.8(b) (effective 1978 to 2020 and reinstated 2022 as 40 C.F.R. § 1508.1(g)(2)) ("[Effects include:] Indirect effects, which are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable.  Indirect effects may include growth inducing effects and other effects related to induced changes in the pattern of land use, population density or growth rate, and related effects on air and water and other natural systems, including ecosystems.").

additional runway as growth-inducing effects . . . ." 655 F.3d at 1139.

Here, KDOW argues the relief line is needed to address existing transmission issues. However, the FEA states the relief line is also "sized to provide for future transmission needs." Even if a "stated purpose" of the relief line is to address existing needs, KDOW tacked on additional transmission capacity that goes beyond existing needs. See id. The relief line upgrade here is akin to replacing a two-lane road with a four-lane highway: even if the old road needed to be fixed anyway, that does not change the fact that the new highway adds additional capacity, nor does it alleviate the environmental impacts of the upgrade.

Additionally, this case is distinguishable from Kilakila, in which we determined a particular telescope project was not a secondary impact of the University of Hawai'i's Observatory Site Management Plan. See 138 Hawai'i at 380-81, 382 P.3d at 192-93. In that case, we noted the management plan had "independent utility by providing guidelines and monitoring strategies that universally apply to all ongoing and future actions within the Observatory Site . . . ." Id. The management plan was not specifically designed to facilitate the telescope project, so it was useful "regardless of whether the Telescope Project [was] built." Id. In contrast, the relief line here is specifically

"sized to provide for future transmission needs."  The relief line adds additional capacity, a purpose of which is to transmit greater quantities of water.  Thus, although the relief line has some utility independent of increased water use, part of its purpose and function is dependent on increased water use.

### 4.    Past or future environmental analysis

The existence of past environmental review or the possibility of future analysis also does not excuse KDOW's obligation to consider water withdrawals as a secondary impact.

First, the FEA does not properly incorporate any previous environmental review documents.  HEPA's administrative rules provided for "consideration of previous determinations and accepted statements" in HAR § 11-200-13 (replaced 2019).  A previous determination may be incorporated by reference if it "has logical relevancy and bearing to the action being considered" and only after "considerable pre-examination and comparison . . . ."  HAR § 11-200-13.  In this case, the FEA for the relief line merely mentions the existence of the Līhu'e Development Plan and the related Water Master Plan.  Even if an FEA was completed for the Līhu'e Development Plan[32] the relief line FEA does not incorporate any previous assessment of water withdrawal impacts.  Thus, if past planning documents analyzed

---

[32]    KDOW asserts that a "Grove Farm FEA" was completed for the "Grove Farm Development."  However, no such document is in the record.

water withdrawals resulting from the relief line or a similar project, KDOW might have met its HEPA obligations by relying in part on those documents, provided their analysis was still pertinent to current circumstances; however, it did not do so here.

Second, the fact that increased surface water withdrawals would be subject to regulatory approval does not excuse KDOW's failure to consider water use as a secondary impact. The FEA discusses the interim instream flow standards[33] for the streams that supply the Līhu'e water system, stating: "The maximum rate of flow from the existing groundwater wells and Waiahi SWTP will not increase as a result of the installation of the proposed Relief Line. As such, the proposed Relief Line is in compliance with both the [Water Resource Protection Plan] and the Interim Instream Flow Standard as contained in HAR § 13-169-45."

---

[33] "Instream flow standard" refers to "a quantity or flow of water or depth of water which is required to be present at a specific location in a stream system at certain specified times of the year to protect aquatic life, wildlife, recreational, aesthetic, scenic, and other beneficial instream uses." HAR § 13-169-2. An "interim instream flow standard" is "a temporary instream flow standard of immediate applicability, adopted by the [CWRM] without the necessity of a public hearing, and terminating upon the establishment of an instream flow standard." HAR § 13-169-2. "Instream flow standards are an integral part of the regulatory scheme established by the [State Water] Code . . . [and] serve as the primary mechanism by which the [CWRM] is to discharge its duty to protect and promote the entire range of public trust purposes dependent upon instream flows." Waiāhole I, 94 Hawai'i at 147-48, 9 P.3d at 459-60 (cleaned up).

The interim instream flow standards for Kaua'i essentially authorized all then-existing diversions around the time the State Water Code was adopted. See HAR § 13-169-45. Following the initial registration of stream diversions, any new or expanded stream diversion has required an amendment to the interim instream flow standard. See HAR §§ 13-169-45, 13-168-31.

Even if increased surface water withdrawals would be subject to the interim instream flow standards set by the CWRM, KDOW still had to analyze water withdrawals as a secondary impact.  This court has explained: "If the fact that other laws and rules that facially appear to bear upon the environmental effects of an activity would exclude the activity from HEPA's purview, then this would frustrate HEPA's purpose of requiring agencies to appropriately consider environmental concerns in their decision-making process."  Umberger v. DLNR, 140 Hawai'i 500, 518, 403 P.3d 277, 295 (2017).  We have previously emphasized the "importance of early environmental assessment" and HEPA's "express mandate that environmental review be undertaken at the 'earliest practicable time.'"  See Sierra Club v. Off. of Plan., 109 Hawai'i 411, 418, 126 P.3d 1098, 1105 (2006) (cleaned up).

Hence, even if increased water withdrawals would be subject to future regulatory approval, KDOW still had to consider secondary impacts or properly incorporate previous analysis of those impacts.

5.    **Procedure on remand**

Finally, we clarify the procedure to be followed on remand.

KDOW may demonstrate in a new EA that increased water withdrawals are not a reasonably foreseeable result of the relief line.  From the record currently before us, there can be

35

no dispute that KDOW failed to take the required "hard look" at the possibility of increased water usage.  Superferry I, 115 Hawai'i at 342, 167 P.3d at 335 (quoting Price v. Obayashi Hawaii Corp., 81 Hawai'i 171, 182 n.12, 914 P.2d 1364, 1375 n.12 (1996)).  However, KDOW may be able to explain in a revised EA why the relief line will likely not facilitate increased water withdrawals.

If KDOW can demonstrate the relief line will likely not increase water withdrawals, it must do so in a revised EA.  That is, KDOW cannot merely present additional evidence to the environmental court on remand.

We have explained that "in a declaratory action brought to challenge an agency's determination that an environmental impact statement is not required, a reviewing court may consider other evidence in addition to the agency record to determine whether the agency decision-maker adequately considered the potential environmental effects and alternatives for a particular project or action."  Kilakila, 138 Hawai'i at 378, 382 P.3d at 190.

The reason for this rule is that

> [t]o limit the judicial inquiry regarding the completeness of the agency record to that record would, in some circumstances, make judicial review meaningless and eviscerate the very purposes of NEPA [or HEPA].  The omission of technical scientific information is often not obvious from the record itself, and a court may therefore need a plaintiff's aid in calling such omissions to its attention.

138 Hawaiʻi at 378, 382 P.3d at 190 (emphasis added) (quoting Sierra Club v. Peterson, 185 F.3d 349, 370 (5th Cir. 1999)).

However, while plaintiffs may present extra-record evidence to identify issues with the environmental review process, an agency cannot rely on extra-record evidence as a substitute for analysis the agency should have included in an environmental review document. The rule allowing extra-record evidence in HEPA cases "is not a two-way street." See Citizen Advocs. for Responsible Expansion, Inc. (I-Care) v. Dole, 770 F.2d 423, 438 n.18 (5th Cir. 1985) (discussing NEPA). "[I]f the agency knew that it could always 'supplement' or 'create' the administrative record in the reviewing court," then the agency "would have little incentive to prepare an adequate and reviewable administrative record, despite the clear mandate of NEPA [and HEPA] that the agency prepare the required record before deciding upon a particular course of conduct." Id. Further, HEPA, like NEPA, "expressly places the burden of compiling information on the agency so that the public and interested government departments can conveniently monitor and criticize the agency's action." Grazing Fields Farm v. Goldschmidt, 626 F.2d 1068, 1073 (1st Cir. 1980).

Additionally, it would frustrate public participation in the HEPA process if agencies could remedy deficient HEPA analysis with evidence submitted to a court after-the-fact. See

Dubois v. U.S. Dep't of Agric., 102 F.3d 1273, 1289 (1st Cir. 1996) ("[P]ost hoc rationalizations are inherently suspect, and in any event are no substitute for the agency's following statutorily mandated [NEPA] procedures.").[34]  While it may sometimes be appropriate for agencies to submit extra-record evidence--for example, to provide context, explain their procedures, or rebut the plaintiffs' evidence--courts must not allow that evidence to pass as explanations or justifications that should have been in the environmental review documents in the first place.

## B.  Cumulative impacts

The FEA also does not properly analyze cumulative impacts. The FEA only considers cumulative impacts at the project site, not cumulative impacts on water resources.

"'Cumulative impact' means the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency or person undertakes such

---

[34]   See also Grazing Fields Farm, 626 F.2d at 1072 (holding that information "contained in the administrative record, but not incorporated in any way into an EIS, [cannot] bring into compliance with NEPA an EIS that by itself is inadequate"); I-291 Why? Ass'n v. Burns, 517 F.2d 1077, 1081 (2d Cir. 1975) (holding subsequent studies could not cure deficient EIS "because they were not circulated for review and comment in accordance with procedures established to comply with NEPA"); Nat. Res. Def. Council, Inc. v. Morton, 458 F.2d 827, 836 (D.C. Cir. 1972) ("The subject of environmental impact is too important to relegate either to implication or to subsequent justification by counsel.  The [EIS] must set forth the material contemplated by Congress in form suitable for the enlightenment of the others concerned." (footnote omitted)).

other actions.  Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time."  HAR § 11-200-2.

We have previously provided the following illustration of cumulative impacts:  "[T]he addition of a small amount of sediment to a creek may have only a limited impact on salmon survival, or perhaps no impact at all.  But the addition of a small amount here, a small amount there, and still more at another point could add up to something with a much greater impact, until there comes a point where even a marginal increase will mean that no salmon survive."  Kilakila, 138 Hawai'i at 381 n.35, 382 P.3d at 193 n.35 (quoting Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt., 387 F.3d 989, 994 (9th Cir. 2004)).

A Ninth Circuit case provides an example of how to analyze cumulative impacts in a water diversion case.[35]  See Ctr. for Env't L. & Pol'y v. U.S. Bureau of Reclamation, 655 F.3d 1000, 1008 (9th Cir. 2011).  That case concerned water withdrawals from Lake Roosevelt, an impoundment of the Columbia River, which was already subject to numerous withdrawals at the time.  655 F.3d at 1003.  The court held the EA for the additional water

---

[35]   "NEPA provides a nearly identical definition of 'cumulative impacts' as HEPA does."  Kilakila, 138 Hawai'i at 381 n.34, 382 P.3d at 193 n.34 (citing 40 C.F.R. § 1508.7 (effective 1978 to 2020 and substantially reincorporated into 40 C.F.R. § 1508.1(g) effective 2022)).

withdrawals properly analyzed cumulative impacts because it examined "both the existing condition of the area and what the effects of the project would be."  655 F.3d at 1008 (cleaned up).  For instance, the discussion of landslide impacts noted how "concern for landslides [was] minor for lake levels above 1,260 feet, moderate for lake levels between 1,240 and 1,260 feet, and major for lake levels below 1,240 feet."  Id.  The EA then concluded "landslide potential would not change as a result of the proposed action, in large part because the additional drawdown during the period when the lake is less than 1,240 feet would be minimal (less than 1 inch)."  Id. (cleaned up).  In other words, the impact of the withdrawals depended on the level of the lake, which was affected by other withdrawals.[36]

Under HEPA's cumulative impact rules, the relief line FEA should discuss additional water withdrawals facilitated by the relief line in relation to existing and anticipated withdrawals. For instance, diverting 1 MGD from a 10 MGD streamflow with no existing or anticipated diversions is different than diverting that same amount if the stream already had diversions of 7 MGD and additional diversions of 2 MGD were planned for a separate

---

[36]    See also Thomas v. Peterson, 753 F.2d 754, 760 (9th Cir. 1985) (holding environmental analysis of logging road must consider cumulative impacts of timber sales); Delaware Riverkeeper Network v. FERC, 753 F.3d 1304, 1319-20 (D.C. Cir. 2014) (holding upgrade to segment of natural gas pipeline must consider cumulative impacts of upgrades to other parts of the pipeline).

future project; the same incremental withdrawal leads to a dry streambed in the latter scenario.

## C.    Segmentation

KDOW may also have improperly segmented the relief line from other projects.

Segmentation was addressed in HAR § 11-200-7 (replaced 2019), which provided:[37]

> A group of actions proposed by an agency or an applicant shall be treated as a single action when:
>
> (1) The component actions are phases or increments of a larger total undertaking;
>
> (2) An individual project is a necessary precedent for a larger project;
>
> (3) An individual project represents a commitment to a larger project; or
>
> (4) The actions in question are essentially identical and a single statement will adequately address the impacts of each individual action and those of the group of actions as a whole.

This court has applied an "independent utility" test to determine whether actions are segmented under HAR § 11-200-7.

---

[37]    The revised rule, HAR § 11-200.1-10, provides:

A group of actions shall be treated as a single action when:

(1) The component actions are phases or increments of a larger total program;

(2) An individual action is a necessary precedent to a larger action;

(3) An individual action represents a commitment to a larger action; or

(4) The actions in question are essentially identical and a single EA or EIS will adequately address the impacts of each individual action and those of the group of actions as a whole.

41

In Kahana Sunset, we held the EA for the drainage system of a development had to include the development itself.  See Kahana Sunset Owners Ass'n v. Cnty. of Maui, 86 Hawai'i 66, 74, 947 P.2d 378, 386 (1997).  In that case, the plans for a development of over 300 residences included a new drainage line connecting to an existing culvert.  86 Hawai'i at 71-72, 947 P.2d at 383-84.  The drainage line would be installed beneath "state or county lands" and did not fall within a HEPA exemption, thus triggering the requirement for an EA.  Id.  The court held the EA had to encompass the entire development, not just the drainage line, stating:

> HAR § 11-200-7 provides that "[a] group of actions proposed by an agency or an applicant shall be treated as a single action when: (1) The component actions are phases or increments of a larger total undertaking; [or] (2) An individual project is a necessary precedent for a larger project." . . . The proposed drainage system is part of the larger project and is a "necessary precedent" for the development.  The drainage system has no independent utility.  It would not be constructed except as part of the larger development.  Isolating only that particular component of the development for environmental assessment would be improper segmentation of the project.

86 Hawai'i at 74, 947 P.2d at 386.  Thus, even though only the drainage line triggered HEPA, the EA had to consider the entire development as part of the same action.  Id.; see also Sierra Club v. Off. of Plan., 109 Hawai'i at 413, 416, 126 P.3d at 1100, 1103 (holding development project triggered HEPA review because drinking water and sewage lines for the development would eventually be installed under state land; the EA had to

address "the environmental effects of the entire Project
. . . .").

In Kilakila, we held that, under HAR § 11-200-7(1), the EA
for the University of Hawai'i Observatory Site Management Plan
did not have to include a particular proposed telescope project.
138 Hawai'i at 379-80, 382 P.3d at 191-92.  We observed that the
guidelines in the management plan applied to the entire
observatory site, which included numerous existing astronomical
facilities.  Id.  We concluded: "Because the Management Plan's
strategies and guidelines apply to the entire Observatory Site
and may be implemented regardless of whether the Telescope
Project is constructed, the Management Plan has independent
utility from the Telescope Project, and, consequently, the
Telescope Project and Management Plan do not constitute a
'single action' under HAR § 11-200-7(1)."  138 Hawai'i at 380,
382 P.3d at 192.

Neither Kahana Sunset nor Kilakila resolves this case.
Whereas the drainage pipe in Kahana Sunset had no independent
utility, the relief line has some utility independent of the
Līhu'e Development Plan and the Waiahi SWTP expansion because it
provides system redundancy and addresses existing needs.  At the
same time, this case differs from Kilakila because the relief
line goes beyond existing needs and includes "additional
capacity" which appears to have no purpose except serving

43

"future development."  This is a novel case because the relief line has some independent utility and some "dependent" utility.

We conclude KDOW is not automatically insulated from Kia'i Wai's segmentation claim merely because the relief line has some independent utility or because some project was necessary to address existing transmission issues.

For instance, the Ninth Circuit[38] held the EIS for a forest road must also analyze impacts of the timber sales the road was "designed to facilitate" because the road did not have "sufficient [independent] utility."  Thomas v. Peterson, 753 F.2d 754, 755, 760 (9th Cir. 1985) (emphasis added).  The court stated: "It is clear that the timber sales cannot proceed without the road, and the road would not be built but for the contemplated timber sales. . . . while the [Forest] Service has stated that the road will yield other benefits, it does not claim that such other benefits would justify the road in the

---

[38]   The NEPA regulations for "connected actions," are analogous to HEPA's segmentation regulations.  See, e.g., Great Basin Mine Watch v. Hankins, 456 F.3d 955, 968-69 (9th Cir. 2006).

Actions are connected if they:

(i) Automatically trigger other actions which may require environmental impact statements.

(ii) Cannot or will not proceed unless other actions are taken previously or simultaneously.

(iii) Are interdependent parts of a larger action and depend on the larger action for their justification.

Id. (citing 40 C.F.R. § 1508.25 (effective 1978 and substantially incorporated into 40 C.F.R. § 1501.9 effective 2020)).

absence of the timber sales."  753 F.2d at 758-59 (emphasis added).

We hold that, because the relief line has some independent utility but also goes beyond existing needs, the question is not whether KDOW would have undertaken some project to address the existing transmission issues and increase system reliability even absent the Līhu'e Development Plan and the Waiahi SWTP expansion; rather, the question is whether KDOW would have undertaken the relief line project as proposed absent the Līhu'e Development Plan and the Waiahi SWTP expansion.[39]  From the record, it appears that, although KDOW might have taken some action to address existing transmission issues, the relief line as proposed is specifically designed to accommodate future transmission needs.  Without the Līhu'e developments and the Waiahi SWTP expansion, the additional capacity provided by the relief line would be extraneous.  However, the record does not

---

[39]   We find this approach sensible in light of Kahana Sunset, 86 Hawai'i 66, 947 P.2d 378.  Suppose in Kahana Sunset the developer had wanted to replace and significantly upgrade an existing drainage line to accommodate the new development, rather than install a new line.  And suppose the existing line was nearing the end of its lifespan and needed to be replaced anyway.  We see no reason why the development should evade environmental review in this situation.  The existing need for a replacement line would not mitigate the environmental impacts of the new development, nor would it change the fact that the purpose of the additional drainage capacity is to facilitate the new development.

We see many similarities between this case and Kahana Sunset, as both cases concern transmission lines (a potable water line and drainage line, respectively) needed for new developments.  The difference is that, in this case, the development may have attempted to hitch a free ride past HEPA review by tacking additional capacity on to a project that was needed anyway.

45

conclusively resolve this issue, so the environmental court is to address it on remand after considering additional evidence from Kia'i Wai.[40]

We note, however, that our inquiry is not limited to the independent utility of the relief line.  The Ninth Circuit has explained that the "independent utility" test can be either a "single" independent utility test or what might be termed a "double" or "multiple" independent utility test:

> ["]The crux of the [independent utility] test is whether 'each of two projects would have taken place with or without the other and thus had independent utility.'"  We have occasionally stated this same test alternatively as "when one of the projects might reasonably have been completed without the existence of the other, the two projects have independent utility and are not 'connected' for NEPA's purposes."  Rather than adopting a single independent utility test, we have focused on whether "each of two projects would have taken place with or without the other," and have extended our analysis to each project.

Sierra Club v. Bureau of Land Mgmt., 786 F.3d 1219, 1226 (9th Cir. 2015) (citations omitted).

We now adopt the "double" or "multiple" independent utility test.[41]  To determine whether projects are improperly segmented under HAR § 11-200-7, courts should consider whether each of the projects would take place independently.  We cited the single

---

[40]   As discussed above, KDOW cannot supplement the record with information that should have been included in the FEA.  This is especially true when public comments on the DEA raised segmentation as a concern.  However, the record before us is insufficient to establish whether the relief line FEA was improperly segmented.  Kia'i Wai must provide additional evidence.

[41]   Although Sierra Club v. Bureau of Land Mgmt., 786 F.3d at 1226, helps describe the difference between a "single" and "double" independent utility test, we do not necessarily adopt the manner in which the Ninth Circuit applied the double independent utility test in that case.

independent utility test in Kilakila, 138 Hawai'i at 379 n.32, 382 P.3d at 191 n.32.  However, in Kilakila we only considered HAR § 11-200-7(1), not any of the other three provisions in HAR § 11-200-7.  See 138 Hawai'i at 379 n.31, 382 P.3d at 191 n.31.  Taking HAR § 11-200-7(2) into account, we conclude the double independent utility test is necessary to effectuate HAR § 11-200-7(2), which applied where "[a]n individual project is a necessary precedent for a larger project . . . ."

Thus, in this case, we must also examine the independent utility of the Waiahi SWTP expansion and the Līhu'e developments.  If the Waiahi SWTP expansion or the Līhu'e developments would not occur without the relief line, then the relief line is a "necessary precedent" to those projects under HAR § 11-200-7(2).

The record suggests the relief line is a necessary precedent for the Waiahi SWTP expansion and the Līhu'e developments.  For instance, at the December 17, 2009 KDOW board meeting, a Grove Farm representative stated that "they need to install this line now" and "the bottom line is the Ehiku line needs to go in if we expand the plant."  Also, the FEA states the relief line is "necessary" for the water transmission needs of the Līhu'e developments.  However, given the lack of information in the record about the Waiahi SWTP expansion and

the Līhu'e developments, we leave this determination for the

environmental court on remand.[42]

Finally, for actions to have been improperly segmented, the

actions must fall within the formal definition of an "action"

under HEPA.[43]  See Superferry I, 115 Hawai'i at 338, 167 P.3d at

---

[42]   We note the relief line may still be a "necessary precedent" for the Waiahi SWTP expansion and the Līhu'e developments even if the transmission line project could have taken an alternate route.  The FEA cannot just conclude the relief line was not strictly "necessary" because some other transmission project hypothetically could have met the needs of the Waiahi SWTP expansion and the Līhu'e Development Plan.  The point is that a major transmission upgrade was needed, even if KDOW and Grove Farm had several options available.  Additionally, the Līhu'e Development Plan cannot avoid review even if Grove Farm hypothetically could have initiated a different transmission project for the Līhu'e developments without the use of public lands or funds.  Contra Sierra Club v. Bureau of Land Mgmt., 786 F.3d at 1226 (holding wind project had independent utility from road on federal land because developers could have used a private road instead).  Perhaps Grove Farm and its consultant could have designed a Water Master Plan for the Līhu'e Development Plan that would have avoided triggering HEPA review, but it appears they did not.  The question is whether the relief line is a necessary precedent for the Līhu'e developments as proposed, not whether some alternative Līhu'e Development Plan could have avoided HEPA review.  Cf. Port of Astoria, Or. v. Hodel, 595 F.2d 467, 477 (9th Cir. 1979) ("By entering into a contract to supply the power to the project and to construct the transmission line to the plant, the agency has so federalized the entire project that it has become 'major Federal action' requiring a federally responsible environmental impact statement." (citations omitted)).

[43]   As defined in HAR § 11-200-2:

"Action" means any program or project to be initiated by an agency or applicant.

. . . .

"Agency" means any department, office, board, or commission of the state or county government which is part of the executive branch of that government.

"Applicant" means any person who, pursuant to statute, ordinance, or rule, officially requests approval from an agency for a proposed action.

"Approval" means a discretionary consent required from an agency prior to actual implementation of an action.  Discretionary consent means a consent, sanction, or recommendation from an agency for which judgment

(continued . . . )

331. The Waiahi SWTP expansion and the Līhu'e developments would appear to be projects initiated by an agency or by a legal entity who, pursuant to statute, ordinance, or rule, officially requested discretionary approval from an agency.[44]  However, the environmental court should make this determination on remand.[45]

In conclusion, we also observe that too broad a reading of the segmentation rules would require boundless HEPA review.  The segmentation rules should be applied using common sense to further informed decision-making.  See HRS § 343-1.  However, this case appears to fall squarely within the segmentation rules.[46]  Although further information is required, the record

---

( . . . continued)
     and free will may be exercised by the issuing agency, as distinguished
     from a ministerial consent.  Ministerial consent means a consent,
     sanction, or recommendation from an agency upon a given set of facts,
     as prescribed by law or rule without the use of judgment or discretion.

[44]     The FEA explains, "In 1994, [the Līhu'e Development Plan] received State
Land Use Commission approval."  On January 28, 2010, the KDOW board approved
Grove Farm's request to expand the Waiahi SWTP.

[45]     Additionally, KDOW argues that KDOW and Grove Farm are separate
entities.  We note that HAR § 11-200-7 stated: "A group of actions proposed
by an agency or an applicant shall be treated as a single action when [any of
four criteria are met.]"  (Emphasis added.)  The 2019 amendments to the HEPA
regulations removed the reference to "an agency or an applicant" and instead
provide that "[a] group of actions shall be treated as a single action when
[any of four criteria are met.]"  See HAR § 11-200.1-10.  In this case, we do
not think KDOW can defeat a segmentation claim merely because Grove Farm and
KDOW are separate entities.  The relief line is intended in large part to
benefit Grove Farm, and Grove Farm will pay one-third of the relief line's
cost.

[46]     Cf. Morgan v. Walter, 728 F. Supp. 1483, 1493 (D. Idaho 1989) (holding,
at the preliminary injunction stage, that the EA for a water diversion system
should include the fish propagation facility that was the recipient of the
water because the fish propagation facility "could not exist absent a
diversion"); Port of Astoria, Or. v. Hodel, 595 F.2d at 477 (holding a
federal agency's contract to supply power to a private aluminum plant could
                                                        (continued . . . )

before us suggests a "clear nexus" between the relief line, the Waiahi SWTP expansion, and the Līhu'e Development Plan.[47]  See Save the Yaak Comm. v. Block, 840 F.2d 714, 720 (9th Cir. 1988). Based on the KDOW meeting minutes and the FEA itself, it appears the relief line "had always been conceptualized as part of the integrated _entire_ project."  See Baykeeper v. U.S. Army Corps of Engineers, No. CIV. S-06-1908, 2006 WL 2711547, at *11 (E.D. Cal. Sept. 20, 2006).[48]

---

( . . . continued)
not be separated from the environmental impacts of the plant itself: "[The agency] shares responsibility for the environmental effects [of the aluminum plant] because its contractual obligation to supply [the corporation] with power enables [the corporation] to build the plant and requires [the agency] to erect transmission lines.").

[47]    Although not in the record, the Water Master Plan prepared in 2009 by Kodani & Associates Engineers, LLC would likely help clarify the relationship between the relief line, the Waiahi SWTP, and the Līhu'e Development Plan.

[48]    To comply with HEPA, KDOW must analyze the relief line's impact on water resources, including cultural practices associated with water resources.  See HAR §§ 11-200-10 (replaced 2019), 11-200-12 (replaced 2019), 11-200.1-13, 11-200.1-21.  We therefore do not reach Kia'i Wai's constitutional arguments concerning the public trust and article XII, section 7 of the Hawai'i Constitution.  See State v. Lo, 66 Haw. 653, 657, 675 P.2d 754, 757 (1983) ("If a case can be decided on either of two grounds, one involving a constitutional question, the other a question of statutory construction or general law, this court will decide only the latter." (cleaned up)).

Kia'i Wai also alleges a violation of HRS § 195D-4, part of the Hawai'i endangered species statute.  Kia'i Wai does not explain, however, how KDOW violated the statute; Kia'i Wai merely cites, without explanation, to a portion of the statute that defines what a threatened species is and authorizes the DLNR to designate threatened species.  Thus, the environmental court properly granted summary judgment in favor of KDOW as to Kia'i Wai's claim under HRS § 195D-4.

## D.    Public comment process

Kiaʻi Wai argues KDOW did not properly consider public comments on the DEA because KDOW filed the FEA too quickly. KDOW transmitted the FEA to the OEQC by letter dated March 12, 2018, the day comments were due (the document was stamped as received by the OEQC March 13, 2018).

Under HAR § 11-200-9.1(c) (replaced 2019): "[T]he proposing agency shall respond in writing to all comments received <u>or postmarked</u> during the thirty-day review period, incorporate comments as appropriate, and append the comments and responses in the final environmental assessment."    (Emphasis added.) Because agencies must respond to comments postmarked within the public comment period, agencies should leave time for comments to arrive by mail before finalizing an EA.

The record does not indicate whether KDOW received any mailed comments after the submission deadline.  However, KDOW's finalization of the EA without waiting to receive mailed comments "does not satisfy the appearance of justice, since it suggests that the [consideration of comments] is an afterthought and that proceedings were merely moving in predestined grooves."

See Mauna Kea Anaina Hou v. BLNR, 136 Hawai'i 376, 391, 363 P.3d 224, 239 (2015) (cleaned up).[49]

## V.   Conclusion

In enacting HEPA, the legislature found that "public participation during the review process benefits all parties involved and society as a whole."  See HRS § 343-1.  From the record before us, it appears public participation in this case was hindered because the FEA did not provide a candid assessment of the relief line's purpose and function.

KDOW erred by limiting the scope of its environmental analysis to the physical footprint of the proposed project. KDOW must issue a new EA[50] that either analyzes the effects of

---

[49]    In Count III of its amended complaint, Kia'i Wai alleged KDOW failed to disclose the substance of input from the CWRM, which KDOW relied on in the FEA.  Additionally, amici argue the FEA includes citations to documents that were not reasonably available to the public.  Although Kia'i Wai asserts the environmental court erred in granting summary judgment in favor of KDOW on Count III, Kia'i Wai does not argue this point in its opening brief.  We therefore decline to address whether KDOW should have made certain underlying information available.  See HRAP Rule 28(b)(7) (2000); Ass'n of Apartment Owners of Wailea Elua v. Wailea Resort Co., 100 Hawai'i 97, 110, 58 P.3d 608, 621 (2002) ("Where an appellant raises a point of error but fails to present any accompanying argument, the point is deemed waived." (citation omitted)).

Kia'i Wai also argues in a conclusory fashion that KDOW's failure to properly consider public comments amounted to a due process violation. Because KDOW's compliance with HEPA's rules will remedy Kia'i Wai's procedural concerns, we do not address Kia'i Wai's due process claims.  See Lo, 66 Haw. at 657, 675 P.2d at 757 (explaining constitutional avoidance doctrine).

[50]    Alternatively, KDOW may opt to prepare an EIS instead of an EA.  See HRS § 343-5(b); HAR § 11-200.1-14(d).

increased water use or explains how the relief line will not facilitate increased water withdrawals.[51]

Hence, for the reasons explained above, we vacate the environmental court's April 2, 2019 order granting partial summary judgment; the October 3, 2019 order granting partial summary judgment, except as to Counts V and VI and as to Kia'i Wai's claim under HRS § 195D-4; the June 30, 2020 order granting

---

[51] We do not address Kia'i Wai's argument that KDOW or Grove Farm require a lease or permit pursuant to HRS § 171-58, which concerns disposition of water from state lands. Because of Grove Farm's interest in this issue, Grove Farm must be made a party to address this issue. See Hawai'i Rules of Civil Procedure Rules 19 (2000) and 21 (1980). For the same reason, we do not decide whether the environmental court lacked jurisdiction over this claim. We also do not address Kia'i Wai's argument about the need for an EIS addressing KDOW's entire water system, as this claim is derived from Kia'i Wai's argument about HRS § 171-58.

As to the question of whether KDOW requires a lease or permit, the briefing is also inadequate. As described in the 2018 CWRM staff submittal, the diversions of Wai'ale'ale Stream and Waikoko Stream, the 'Ili'ili'ula North Wailua Ditch, which carries the diverted water to hydroelectric plants, and the Upper and Lower Waiahi Hydropower plants are operated by Kaua'i Island Utility Cooperative ("KIUC"). KIUC does not control the use of the water once it leaves the tailrace of the Lower Waiahi Hydropower plant. Additionally, the diversion of the South Fork Wailua River that supplies the Kapaia Reservoir appears to be located on Grove Farm land rather than state land. In sum, it appears the diversions on state land are operated by KIUC, and Grove Farm and KDOW receive the diverted water later after it passes through KIUC's hydropower plants.

KIUC may have a permit or lease pursuant to HRS § 171-58, and the parties do not discuss what bearing this may have on how HRS § 171-58 applies to KDOW or Grove Farm. The parties also do not discuss whether county departments of water would be required to bid against private entities under Kia'i Wai's interpretation of HRS § 171-58. The parties also do not discuss HRS § 171-95 (2011 & Supp. 2016), concerning disposition of public lands to counties and other governmental agencies; HRS § 171-11 (2011), concerning set-asides of public lands to counties and agencies for public use or purpose; or HRS § 46-1.5(23)(f) (Supp. 2018), concerning the power of counties to take over waterworks systems from the State. We do not determine whether these and other statutes are relevant. Finally, the parties do not discuss "the express constitutional and statutory designation of the [CWRM] as the final authority over matters of water use planning and regulation," which limits the powers of the counties. See Waiāhole I, 94 Hawai'i at 188, 9 P.3d at 500.

partial summary judgment, except as to Count III; and the June 30, 2020 order entering final judgment in favor of KDOW. We remand this case to the environmental court for further proceedings consistent with this opinion, including a determination of whether injunctive relief is warranted.

Lance D. Collins and
Bianca Isaki
for Plaintiff-Appellant

Naomi U. Kuwaye
Rosemary T. Fazio and
Nicholas G. Altuzarra
for Defendant-Appellee

Leinā'ala L. Ley and
Isaac H. Moriwake
for amici curiae

/s/ Mark E. Recktenwald

/s/ Paula A. Nakayama

/s/ Sabrina S. McKenna

/s/ Michael D. Wilson

/s/ Todd W. Eddins

